[Civ. No. 27400. Fourth Dist., Div. Two. Mar. 16, 1983.]

OWEN F. GOODMAN et al., Plaintiffs and Appellants, v.
COUNTY OF RIVERSIDE, Defendant and Respondent;
DESERT WATER AGENCY et al., Interveners and Respondents.

COUNSEL

Owen F. Goodman, in pro. per., and for Plaintiffs and Appellants.

Thomas J. Graff and John W. Krautkraemer, as Amici Curiae on behalf of Plaintiffs and Appellants.

Gerald J. Geerlings, County Counsel, and Loyal E. Keir, Deputy County Counsel, for Defendant and Respondent.

Best, Best & Krieger, Arthur L. Littleworth, Anne T. Thomas, George Deukmejian and John Van de Kamp, Attorneys General, R. H. Connett, Assistant Attorney General, Emil Stipanovich, Jr., Deputy Attorney General, O'Melveny & Myers, Donald M. Wessling, Carl Boronkay, Warren Abbott, James W. Mountain, Surr & Hellyer and Robert J. Bierschbach for Interveners and Respondents.

OPINION

McDANIEL, J.—Owen F. and Ann S. Goodman own real property within the boundaries of the Desert Water Agency (DWA). The DWA levied ad valorem taxes on their property to help fund DWA's payments on its water supply contract with the California Department of Water Resources. The taxes were later collected on behalf of DWA by the County of Riverside.

The Goodmans (plaintiffs) filed an action against the County of Riverside to recover the taxes. They alleged that the levy and collection of these taxes violated article XIII A of the California Constitution, popularly known as Proposition 13. As the real party in interest, DWA intervened as a defendant, as did the California Department of Water Resources (the Department), the Metropolitan Water District of Southern California (MWD), the San Gorgonio Pass Water Agency, and five banks which own, or hold as trustees, the bonds sold to provide funds to construct the state water project.

The case was tried largely on stipulated facts. Four issues were presented, only two of which concern us on this appeal:

(1) Whether taxes levied by local agencies, such as DWA, to raise money due under their state water contracts are levied to pay an "indebtedness approved by the voters" before July 1, 1978, so as to come within the exception set out in section 1, subdivision (b) of article XIII A;

(2) If not, and if article XIII A therefore operates to outlaw such taxes, whether XIII A violates the contract clause of the state or federal Constitutions.

The trial court decided against the plaintiffs on both these issues, ruling that the taxes in question fell within the exception noted, having been levied and collected to pay an indebtedness previously approved by the voters. The court also ruled that a contrary construction of the ballot measure would impair the rights of the bondholders noted so as to make article XIII A unconstitutional under the contract clause of the federal Constitution. This appeal followed.

## OVERVIEW OF THE STATE WATER PROJECT

The California water plan (Plan) is a comprehensive master plan for California's present and future water conservation, distribution, and utilization. The components of the Plan include the state water project, together with both federal and local developments. It is the state water project which concerns us here.

The state water project (Project) consists of a series of 21 dams and reservoirs, 5 power plants, and 16 pumping plants which stretch from Lake Oroville in Butte County to Lake Perris in Riverside County. Project water flows from the Feather River to the Sacramento River and then into the Sacramento-San Joaquin Delta. It is lifted by the Delta Pumping Plant into the California Aqueduct, and the aqueduct conveys it south.

The Project has been financed in part by state bonds issued pursuant to the Burns-Porter Act (the Act).[1] The Act was confirmed by the voters in November 1960 "to provide funds to assist in the construction of a State Water Resources Development System for the State of California." (§ 12931.) The Act directs the Department to enter into contracts for the sale, delivery or use of water or power, or for other services and facilities made available by the State Water Resources Development System (System). (§ 12937, subd. (b).)

Proceeding under this statutory directive, the Department has entered into 31 such water contracts with local governmental entities with taxing powers, such

---

[1](Wat. Code, §§ 12930-12944, Stats. 1959, ch. 1762, p. 4234.) The official title of the Act is the California Water Resources Development Bond Act. (Wat. Code, § 12930.) The Project was also to be financed with money from the California Water Fund. (Wat. Code, § 12938; see Wat. Code, §§ 12900-12915.)

as DWA. The contracts require regular payments to the state in return for participation in the System. Not all the districts actually receive water,[2] but all must make payments according to their respective maximum annual water entitlements and the portion of the System required to deliver such entitlements. Those which actually receive water also pay amounts attributable to the water received.

### EVENTS LEADING UP TO THE VOTERS' APPROVAL OF THE BURNS-PORTER ACT

A number of studies on the feasibility of the Project were made before the Act was approved by the voters in 1960. The financial aspects of the Project were, needless to say, of particular concern.

The Legislature's Joint Committee on Water Problems reported in 1958 that "A firm tax base is required to support any general obligation bond issue," (Twelfth Partial Rep. by the J. Com. on Water Problems, "Economic and Financial Policies for State Water Projects," (Mar. 24, 1958) p. 23) and Bulletin 78 of the Department of Water Resources, published in 1959, stated that if the Project were to be self-liquidating it would be necessary to obtain money for costs not met by water sale revenues, and that such money could be obtained from "taxes in service areas, in some such manner as has been employed by The Metropolitan Water District to provide funds for the Colorado River Aquedect. . . ." (Dept. Water Resources, Bull. No. 78, "Investigation of Alternative Aqueduct Systems to Serve Southern California," (Dec. 1959) p. 27.)

Accordingly, the Senate Factfinding Committee on Water Resources recommended that the water delivery contracts required under the Act be made "only with public agencies with taxing powers." (Partial Rep. of the Factfinding Com. on Water Resources, "Contracts, Cost Allocations, Financing for State Water Development," (Mar. 1960) p. 10.)

The Report of the Senate Committee concluded: "Legislation should require that rates for services from the facilities be set so as to return with interest the reimbursable expenditures on the facilities, whether made from bond funds or the California Water Fund." (*Id.* at p. 9.)

About nine months *before* the election at which the Act was approved, the Department published the "Governor's Contracting Principles for Water Service Contracts." The contracting principles were precisely that, i.e., rules for implementing the water contracts required under the Act.

---

[2]The San Gorgonio Pass Water Agency, for example, makes payments although it does not yet receive water.

The Department was the administrative agency responsible for negotiating the contracts required by the Act. The contracting principles represent the Department's construction of that portion of the Act dealing with the contract requirements. The Governor's Contracting Principles not only carried out the Senate Committee on Water Resources' recommendation that water contracts be made only with public agencies with taxing power, but also specifically required that the contracts provide for the mandatory use of local taxes:

"Each contracting agency will agree that, in the event in any year it is unable or fails through other means to raise the funds necessary in any year to pay the state the sum required under the contract [i.e., enough to pay all costs of the system], *it will use its taxing or assessment power to raise such sum.*" (Italics added.)

The contracting principles also indicated that contract rates should be set so as to return to the state: ". . . all costs of project operation, maintenance and replacement, all principal and interest on (1) bonds, (2) expenditures from the California Water Fund, and (3) other monies used in the construction of the project works."

After the contracting principles were published, but before the Act was approved by the voters, the Department entered into its first local water supply contract pursuant to the Act with MWD. The contract was negotiated on the basis of the contracting principles, and was contingent on the Act's later approval. Negotiations were of statewide significance because it was generally recognized that the contract would be the prototype for all later Project contracts, for article 45 of the MWD contract required that the basic terms and conditions of all later contracts be substantially uniform.

Consistent with the requirements of the Act and the contracting principles, article 5 of the MWD contract provided: "This contract is entered into for the direct benefit of the holders and owners of all general obligation bonds issued under the [Burns-Porter] Act, and the income and revenues derived from this contract are pledged to the purposes and in the priorities set forth in that Act."

Also consistent with the contracting principles, the contract further provided in article 34(a): "If in any year the District fails or is unable to raise sufficient funds by other means, the governing body of the District shall levy upon all property in the District not exempt from taxation, a tax or assessment sufficient to provide for all payments under this contract then due or to become due within that year."

These two provisions appear in all later water supply contracts, including those of DWA and the San Gorgonio Pass Water Agency.

In addition to the Senate Committee Report, the contracting principles, and the MWD contract, there were political press releases,[3] an analysis by the League of Women Voters,[4] and reports by outside consultants[5] which all indicated that contract payments would pay for the cost of the entire Project, and that local property taxes, in addition to user charges, were available if revenues from water sales were not enough to pay such cost.

---

[3]Alan Cranston, then State Controller, noted in a press release: " 'As additional security for the bonds, and to prevent a drain on the General Fund in case of deficiency, the local contracting agencies will have ad valorem taxing power over and above the cost of water which the user will pay. [¶] Local agencies will therefore be able to meet their commitments to the State even if revenues from local sales of water are not sufficient for this purpose. [¶] Through this procedure, the beneficiaries of the Water Plan become the financial keystone and support rather than the General Fund and the general taxpayer.' "

Governor Pat Brown's press comments at the time are also informative:

"Governor, what is your answer to people who say, 'I don't want to pay for somebody else's water.' Like San Franciscans. 'I have already paid for one water project. Why should I be compelled to buy another?'

"GOVERNOR BROWN: Well, they won't. The plan itself is completely self-supporting. The law provides that the *contracts* have to provide for the repayment of the cost of the *entire* Project. That's the real answer to it." (Italics added.)

[4]The League of Women Voters' analysis observed: "The state will contract with public agencies having the assessment power so they can meet the required payment to the state by the use of taxes as well as water rates if they so desire. In this way no area will be subsidizing water for another region."

[5]As the report of Chas. T. Main, Inc., consultant to the Department of Water Resources, said: "Rates for water and power and for other reimbursable items [i.e., charges to the local agencies] will be established so as to return to the State *all costs* of project operation, maintenance and replacement, all principal and interest on (1) bonds, (2) expenditures from the California Water Fund, and (3) other monies used in the construction of the project works. Since the water delivery contracts are proposed to extend as long as the bond repayment period, we consider that in order to fulfill the above requirement revenues must be developed during this period sufficient to return *all such costs*." (Final Report, "General Evaluation of the Proposed Program for Financing and Constructing the State Water Resources Development System of the State of California Department of Water Resources," (Oct. 1960) p. 2.)

Dillon Reed & Co., Inc., a second outside consultant on the "financial aspects of the State's water program," reported in October before the statewide vote: "The Program contemplates that the contractors for the water to be delivered by the Program will be municipal corporations, water districts and similar public agencies with local taxing power, and that, as suggested by the Department, at least part or all of the aqueduct charge may be recovered by these contractors through the levy of taxes or assessments on real estate within their respective jurisdictions." (Report of Financial Consultants to State of California Water Resources, "Financial Aspects of Program for State Water Resources Development System." (Oct. 26, 1960) p. 24.)

An outside consulting firm engaged to review the financial feasibility of the State Water Project examined each service area's capacity to pay and concluded that virtually all contracting areas would have to rely in part upon taxes to pay the full costs of the Project. In some areas, the consultant even projected the amount of local taxes which would be required. For example, the report estimated a need in 1990 for tax rates of 15 cents per $100 of assessed valuation in Ventura County, 21 cents in the Antelope-Mojave Valley, 33 cents in the Coachella Valley and Palm Springs area, and 18 cents within the Metropolitan Water District, including as a factor in its computations the cost of local facilities. (Append. to Final Report, "General Evaluation of the Proposed Program for Financing and Constructing the State Water Resources Development System of the State of California, Department of Water Resources," (Oct. 1960) pp. 81-91.)

## DISCUSSION

Proposition 13, article XIII A, section 1, provides: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to [July 1, 1978]."

■ The purpose of article XIII A is to restrict ad valorem real property taxes, while at the same time honoring already-approved debts. The debt need not be bonded debt (*County of Shasta* v. *County of Trinity* (1980) 106 Cal. App.3d 30, 39 [165 Cal.Rptr. 18]), nor need it be expressed as a particular, concrete sum (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, 326-327 [182 Cal. Rptr. 506, 644 P.2d 192]); it can be the amount necessary to fund a particular obligation, even one which stretches far into the future (*id.* at pp. 325-326).

As noted above, the major issue on appeal is whether taxes levied by local agencies to raise money due under state water contracts are levied to pay an "indebtedness approved by the voters" before July 1, 1978, so as to come within the exception of section 1, subdivision (b).

The Goodmans concede that in 1960 the voters approved an indebtedness, but contend that the indebtedness is limited to the $1.75 million in bonds authorized by the Act. They then argue, because the state is the debtor on the bonds, that only state taxes could come within Proposition 13's section 1, subdivision (b) exemption.

■ In order to interpret the Act so as to carry out the intent and objective of its drafters and of the people who approved it (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 495 [159 Cal.Rptr. 494, 601 P.2d 1030]), we must consider not only the language of the Act, but also its historical context (*California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 177-178 [148 Cal.Rptr. 875, 583 P.2d 729]) and extrinsic aids such as committee reports and legislative debates associated with the Act. (*Noroian* v. *Department of Administration* (1970) 11 Cal.App.3d 651, 655 [89 Cal.Rptr. 889].)

In addition, the provisions of the contracting principles and the MWD contract are particularly useful in interpreting this Act. They were matters of public record, widely publicized before the election. They represent a contemporary

administrative directive, which was known to the voters at the time of the election. The voters were aware that all future water contracts would be implemented pursuant to the contracting principles, and by voting for the Act they approved the contracting principles. The contracting principles also were accepted by the Legislature, which, with knowledge of them, appropriated funds for the project in the Budget Act of 1960 (Stats. 1961, ch. 11, p. 20, items 257, 353, 354, 355), thus indicating legislative approval of the administrative directive. (*Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 184 [28 Cal.Rptr. 724, 379 P.2d 28].) Both the contracting principles and the MWD contract are an important source of the Act's meaning, and the Act must be construed in light of their contents. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].)

■ We first consider the question of what constituted the indebtedness approved by the voters when they voted in favor of the Act.

The terms of the Act provide for the creation of a fund, the California Water Resources Development Bond Fund (Bond Fund), to provide for the acquisition, construction and completion of the state water facilities and for additions to the System. This fund was to be created by the authorization of $1.75 billion of bonds. (§ 12935.)

The Goodmans make much of the fact that section 12935 states that the debt created "in the manner and to the extent herein provided" is to be "*not otherwise nor in excess*" of the $1.75 billion. (Italics added.) For some reason, they conclude that this means that the only indebtedness involved in the Act is the amount represented by the bonds authorized by section 12936. However, bearing in mind that the Plan (§ 12900 et seq.) was also to be a source of funds for the System (§ 12938), and that revenues and income from the System were pledged to repay not only interest and principal on the bonds authorized to create the Bond Fund (§ 12937, subd. (b)2), but also to pay the reasonable costs of annual maintenance, operation, and replacement of the System (§ 12937, subd. (b)1), and to refund monies utilized from the California Water Fund (§ 12937, subd. (b)3), it is clear that the indebtedness involved includes not only the $1.75 billion *bonded* indebtedness, but the cost of maintaining, operating and replacing the system, and of repaying the California Water Fund. The phrase "*not otherwise nor in excess*" on which the Goodmans rely, refers only to the *amount of bonded* indebtedness.

This interpretation is borne out not only by the very terms of the Act, but by the numerous extrinsic sources, discussed above, which made it clear before the election that *all* costs of the Project were contemplated as costs to be repaid by the revenues and income from the System.

The Goodmans' next contention is, even if the indebtedness approved consisted of all costs of the System, that the state is the debtor on the indebtedness, that DWA never assumed any part of the debt, and that therefore taxes levied by the DWA to pay part of its water contract are not levied to pay that indebtedness. They take the position that the taxes levied by DWA are to pay DWA's indebtedness to the state. This indebtedness was supposedly one created when DWA entered into its state water contract, and one which was never approved by the voters. They put much emphasis upon the fact that the voters did not approve the contracting agencies' "assumption" of any part of the indebtedness created by the Act nor the execution of any specific agency contracts.

While it is true that there was no voter approval in 1960 of any specific agency contract, we do not agree that there was no approval of the contracting agencies' ultimate responsibility for the indebtedness. The Act and the contracting principles included the *requirement* that the Department enter into water contracts with agencies with taxing powers. The entire cost of the Project was to be met by the proceeds of these contracts. The state's General Fund was clearly nothing more than a conduit for the contract payments, with the state, practically speaking, serving as a guarantor that payments would be timely made, even if the contract payments were insufficient in any particular period to meet the interest and principal payments on the bonds. Any general funds expended for bond repayment were to be repaid, with interest, from the Bond Fund. (See § 12937, subd. (a).) In short, when the voters approved the Act, they also approved the indebtedness of the contracting agencies, and moneys paid to such agencies were clearly intended to pay an "indebtedness approved by the voters." In this connection, the voters also knew that property taxes would be an obvious source of funds from which these payments would come, not only because of the preelection information discussed above, but because the Act itself provided that any facilities constructed with funds made available under the Act were not only to be acquired and constructed, but also operated and maintained pursuant to the provisions of the Water Code which governs the Central Valley Project.[6] (Wat. Code, § 12931.) The Water Code sections governing the Central Valley Project were incorporated by reference into the Act (*Metropolitan Water Dist.* v. *Marquardt, supra,* 59 Cal.2d 159, 176), and one of those sections, section 11652, provides that districts with water contracts "shall, whenever necessary, levy upon all property in the state agency not ex-

---

[6]The Central Valley Project (Wat. Code, §§ 11100-11925) was approved by the Legislature and state voters in the early 1930's. As originally proposed it was to be financed with revenue bonds, with revenues to be generated by the sale of water and power. Efforts to sell the bonds were unsuccessful, in part because of the Great Depression and in part because the state's general credit did not guarantee payment. (1 Rogers & Nichols, *Water for California* (1967) § 28, p. 47.) We note in passing that perhaps this earlier failure to sell water bonds not guaranteed by the state's general credit explains the use of the General Fund as a conduit for bond repayment as set out in section 12937.

empt from taxation, a tax or assessment sufficient to provide for all payments under the contract. . . ." State agencies, as used in the section, include local water agencies. (Wat. Code, § 11102.)

Considering all of the commentary above, we conclude, when the state's voters approved the Act, that they approved an indebtedness in the amount necessary for building, operating, maintaining, and replacing the Project, and that they intended that the costs were to be met by payments from local agencies with water contracts. Further, we conclude that the voters necessarily approved the use of local property taxes whenever the boards of directors of the agencies determined such use to be necessary to fund their water contract obligations, and that the ad valorem taxes levied by DWA fall within the exception of section 1, subdivision (b).

Our conclusion here does away with the necessity to address the issue of impairment of contractual obligations. We note, however, that an unconstitutional impairment may arise when only a *portion* of a bondholder's security has been removed (*United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 19 [52 L.Ed.2d 92, 107, 97 S.Ct. 1505]), and that the fact that the state's General Fund is the ultimate source to which bondholders may look is, in these days of huge deficits, of probably less importance to a creditor than the belief that, should user charges be inadequate, the property owners who also benefit because of the Project may also be called upon to pay its costs.

A few points remain to be resolved. Section 12937, subdivision (b) of the Act provides that all revenues from the water contracts and other sources are to be deposited into a trust fund, and used for the following purposes and in the following priority:

"1. The payment of the reasonable costs of the annual maintenance and operation of the State Water Resources Development System and the replacement of any parts thereof.

"2. The annual payment of the principal of and interest on the bonds issued pursuant to this chapter.

"3. Transfer to the California Water Fund as reimbursement for funds utilized from said fund for construction of the State Water Resources Development System.

"4. Any surplus revenues in each year not required for the purpose specified in the foregoing subparagraphs (1), (2) and (3) of this subdivision (b) of Section 12937 and not required to be transferred to the General Fund pursuant to sub-

paragraph (a) of this Section 12937, shall, during the time any of the bonds authorized herein are outstanding, be deposited in a special account in the California Water Resources Development Bond Fund and are hereby appropriated for use and shall be available for expenditure by the department for acquisition and construction of the State Water Resources Development System as described in Section 12931 hereof.''

Section 12931 provides in part: "The object of this chapter is to provide funds to assist in the construction of a State Water Resources Development System for the State of California. Said system shall be comprised of the State Water Facilities as defined in Section 12934(d) hereof and such additional facilities as may now or hereafter be authorized by the Legislature as a part of (1) the Central Valley Project or (2) the California Water Plan, and including such other additional facilities as the department deems necessary and desirable to meet local needs, including, but not restricted to, flood control, and to augment the supplies of water in the Sacramento-San Joaquin Delta and for which funds are appropriated pursuant to this chapter.''

The Goodmans contend that the indebtedness should be narrowly defined to further the purposes of article XIII A, and that it should not be defined so as to include the amounts to pay items 1, 3, and particularly 4 of section 12937, subdivision (b). However, as explained earlier, it is clear that the voters approved a debt which consisted not only of the principal and interest on the bonds, but of these other expenses as well. Nor do we think that the use of surplus revenues authorized by 4 is the kind of open-ended government spending which the Goodmans claim is prohibited by article XIII A; revenues first *must* be applied towards items 1, 2, and 3, and then to replace any monies paid out from the General Fund for payments on the bonds which have not yet been reimbursed from the contract revenues. If any revenues are left after such application (and there is no evidence that there have been or will be any surplus revenues), they may then be used for the circumscribed purpose as set out in section 12931 *if* such purpose is necessary and desirable, and then only during the limited period of time when any of the authorized bonds are outstanding.

■ There is also a contention, made by amici curiae, that DWA did not introduce evidence that it was unable to raise sufficient revenues through user charges, so as to make the levied property tax necessary. That issue was not raised at trial. However, evidence was introduced which showed that the levy met all legal requirements, and that DWA's board of directors had found that the tax levied was the minimum amount necessary to be raised by taxation, after DWA had relied, to the extent feasible, on pumping and user charges. Legislative acts of a local public agency are to be presumed valid. (*Kahn* v. *East Bay Mun. Util. Dist.* (1974) 41 Cal.App.3d 397, 409, 414-415 [116

Cal.Rptr. 333].) The burden was on the Goodmans to show that the board of directors acted improperly, and they did not meet that burden.

## DISPOSITION

The judgment appealed from is affirmed.

Kaufman, Acting P. J., and Rickles, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 14, 1983.